**MESCHKOW & GRESHAM, P.L.C.**
Jordan M. Meschkow (AZ Bar No. 007454)
Lowell W. Gresham (AZ Bar No. 009702)
5727 North Seventh Street
Suite 409
Phoenix, Arizona 85014-5818
(602) 274-6996
(602) 274-6970 (facsimile)
Email: mg@patentmg.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DAN COOGAN, doing business as Coogan Photographic,<br><br>      Plaintiff,<br><br>v.<br><br>AVNET, INC., et al.,<br><br>      Defendants. | **Case No.: CV-04-0621 PHX SRB**<br><br>**PLAINTIFF'S MOTION FOR DISQUALIFYING DEFENDANTS' EXPERT JOHN TROTTO AS AN EXPERT WITNESS AND TO EXCLUDE HIS REPORT AND TESTIMONY FROM EVIDENCE**<br><br>**(Assigned to The Hon. Susan R. Bolton)** |

Plaintiff Dan Coogan ("Coogan"), pursuant to Rules 403, 702, and 703, FED. R. EVID., moves this Court to disqualify John Trotto as an expert witness in this case, and to exclude him from testifying at trial, to include the exclusion of any references by any of the Defendants ("Defendants") to Mr. Trotto, his qualifications, his Report, his opinions, or his exclusion. This Motion is supported by the attached Memorandum of Points and Authorities and the entire Court record in this case, incorporated herein by reference.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    BACKGROUND

On September 2, 2005, Defendants disclosed John Trotto ("Trotto") as their sole expert in this case:

> Mr. Trotto is expected to testify regarding the quality of photographs at issue, fees customarily charged for photo shoots, usage of and rights to the type of photographs at issue in this case, plaintiff's business records and reputation in the community, and the reasonableness of plaintiff's alleged damages in light of the fees he customarily charges.

*See* Avnet's Second Supplemental Disclosure Statement, attached hereto as Exhibit A. At Trotto's deposition, however, both Trotto and defense counsel emphatically and repeatedly

8050-0131-162                                        1

confirmed that Trotto is not being offered as an expert on *anything*, including damages, except the fair market value of Plaintiff's non-infringed photographs. This revelation by Trotto and defense counsel explained why Trotto's purported expert report (the "Report"), served on Plaintiff on January 10, 2006 and attached hereto as Exhibit B, was not only irrelevant to the issue of damages in this case, but was virtually incomprehensible.

In addition to Trotto's proffered expertise being completely irrelevant to this case, neither Trotto nor Defendants have offered any evidence that Trotto is qualified to opine as an expert as to the fair market value of the photographs in this case. Trotto's photography, and, therefore, his pricing, are not even the same type as the photos in this case—Trotto engages mainly in assignment photography, while the photographs at issue are stock photography. The differences between the two are distinct, as recognized by federal courts and explained more fully below. Moreover, Trotto's entire opinion is based on his own subjective pricing in his own business; indeed, Trotto admitted that his figures were in no way an industry standard or even supported by the industry, by other photographers, by other experts in the field, or by any other support other than his own pricing schedule.

Finally, in addition to Trotto's lack of qualifications and unreliable methods and conclusions, he also has overwhelming biases. For example, Trotto formerly employed Plaintiff in Trotto's photography business, is now a direct competitor of Plaintiff's, took over Plaintiff's job with Defendants when this lawsuit arose, and admits that he would stop at nothing to continue to be employed by Avnet. Deposition of John Trotto, January 25, 2006, at 9:51:34, 14:15:44-52, and 14:51:37-14:51:48, attached hereto as Exhibit C ("Trotto Deposition"). In short, Trotto meets none of the requirements for expert testimony under the Federal Rules of Evidence or *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ("*Daubert*") and its progeny, and, therefore, must be disqualified and have his Report and testimony excluded as evidence in this case.

## II.    ARGUMENT

Pursuant to the Federal Rules of Evidence and *Daubert*, in determining whether expert testimony is admissible, courts must consider not only the relevance of the

8050-0131-162                                      2

testimony, but also the expert's qualifications and the reliability of his methods and conclusions. Rule 702, FED. R. EVID. The burden of showing that these standards are met falls on the proponent(s) of the expert testimony, the Defendants in this case. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995) (holding that a proponent must do more than simply make a prima facie case on reliability).

### A.    Trotto's Testimony is Inadmissible Under Rules 702, 703, FED. R. EVID.

Rule 702 requires that, *if* specialized knowledge will assist the trier of fact, *and* the purported expert is qualified by "knowledge, skill, experience, training, or education," such expert may testify to his or her opinion *if*

> (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Similarly, Rule 703 requires that the "facts or data… upon which an expert bases an opinion or inference" must be "of a type reasonably relied upon by experts in the particular filed in forming opinions or inferences upon the subject[.]" FED. R. EVID. 703. Neither Trotto, his Report, nor his testimony meets *any* of these requirements.

### 1.    Trotto's purported "specialized knowledge" will not assist the trier of fact in this case.

Courts must reject expert testimony that "is based upon premises lacking any significant support or acceptance within the scientific community, *or that otherwise would be only marginally helpful to the fact-finder.*" FED. R. EVID. 702, Advisory Committee Notes (emphasis added). The only remaining issues in the case relate to damages; yet Defendants are adamant that Trotto is not a damages expert. During Trotto's deposition, both Trotto and defense counsel, Jordan Green, repeatedly insisted that Trotto is not an expert on copyright licensing, copyright infringement, damages, damages calculations, photograph pricing, or actual damages.[1] Rather, as shown below in numerous excerpts

---

[1] "Congress explicitly provides for two distinct monetary remedies—actual damages and recovery of wrongful profits. These remedies are two sides of the damages coin—the copyright holder's losses and the infringer's gains. 'Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the

from Trotto's deposition, Trotto is testifying *only* to what he believes "fair market value" of Plaintiff's infringed photographs to have been *before* they were infringed, based upon the subjective pricing system he utilizes in his sole-proprietorship photography business:

> Q:   So essentially you are explaining the value of the photographs had no infringement occurred and are you not opining on damages?
> …
> A:   I'm not expected to assess damages. … I have been asked to give my opinion of the market value of the photographs at the time of the infringement.
> Q:   Okay. But not after the infringement?

Trotto Deposition, 10:23:15-44.

> Q.   You're not testifying on damages for the copyright infringement?
> A.   I've been asked to give the fair market value of the photographs.
> Q.   Okay. In your report on page 8… you say will you assess actual damages for Mr. Coogan. Isn't that what you're saying?
> A.   Yes.
> Q.   What's the first quote that starts on page 8 say?
> A.   "Actual damages as to the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement."

Trotto Deposition, 10:50:18-10:51:19

> Q.   Are you here to testify as to what actual damages would be?
> A.   To the extent that actual damages to Mr. Coogan are the same as the market value, then the answer would be yes.
> Q.   And is that market value the same value of the market value of a work that has been injured or destroyed?
> A.   That is not for me to determine.

Trotto Deposition, 10:54:23-10:55:04.

> MR. GREEN: …the witness has previously said about 20 times that the only thing he was asked to do was offer an opinion on fair market value that a willing buyer and willing seller would agree upon in the open market. You keep using actual damages which is a legal term which he doesn't fully appreciate or understand.
> MR. MESCHKOW:   Okay. I'd like to get on the record that your notice of disclosure says one of the things he's going to testify is the reasonableness of plaintiff's alleged damages.
> MR. GREEN:  I understand that that's what our disclosure statement says.
> MR. MESCHKOW:   So you're telling me now that you don't have an expert witness that's going to testify on actual damages.
> MR. GREEN:  I am telling that you as to the part of actual damages that relates to fair market value, this is our expert. There is no other expert.

Trotto Deposition, 13:08:11-13:09:04.

> Q.   Is that in your calculation here on page 9?
> A.   I was asked to give the fair market value of the photos, to use your term, at arm's length negotiations
> Q.   I see.
> A.   It's not my job to determine other fees.

infringement or by the value of the use of the copyrighted work to the infringer.'" *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 707-08 (9th Cir. 2004) (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)); *see also Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir.2002).

8050-0131-162                                      4

Trotto Deposition, 13:22:39-13:22:58.

In short, the only thing on which Trotto is purporting to testify as an expert is the fair market value of photographs that had not yet been infringed. The only relevant issue remaining in this case, however, is the amount of damages owed Plaintiff for the willful infringement of Plaintiff's copyright-protected photographs. Calculation of such damages is determined by the *reduction* in fair market value *and* the infringer's profits attributable to the infringement, not, as Trotto would have the Court believe, the fair market value of the photographs absent any infringement.[1] Thus, Trotto's testimony does not assist the factfinder with any issues relevant to this case and should, therefore, be excluded.

### 2. Trotto is not qualified as an expert by "knowledge, skill, experience, training, or education," relevant to the damages calculations in this case.

Trotto's lack of capacity to testify to anything relevant to this case likely arises from his lack of any of the relevant "knowledge, skill, experience, training, or education" required by Rule 702, FED. R. EVID. Trotto freely admits that he has no formal education, training, or other knowledge of photography pricing or copyright infringement damages, and has never been considered an expert in any of these areas:

Q.  Have you ever been deposed before or attended a deposition?
A.  No.

Trotto Deposition, 9:34:35-9:34:38

Q.  But you have no formal training in photography?
A.  That's correct. I'm self-taught in photography.
Q. Have you had any experience or training in copyright matters or copyright law?
A.  No.
Q.  Have you ever filed for a copyright registration?
A.  No, I have not.

Trotto Deposition, 10:08:40-10:08:55.

Q.  On the qualifications page as well, it says you've not been an expert witness in any other cases. Is this true?
A.  That's true.

Trotto Deposition, 10:12:36-10:12:42.

Q.  And for the record, can you tell me what ASMP is?
A.  A business organization to help photographers.
Q.  Are you a member?
A.  No.
Q.  Have you ever been a member?
A.  No.

Trotto Deposition, 10:20:26-10:21:07.

8050-0131-162                                    5

Q. Did you ever study at all the history of licensing?
A. No.
Q. So do you know what the history of licensing is?
A. No.

Trotto Deposition, 14:58:34-43. In addition to Trotto's complete lack of formal training or credentials relevant to this case, the only knowledge on which Trotto relies—his own life and business experiences—is the *wrong* kind of experience for this case.

As set forth below and discussed in detail in *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003), *infra*, professional photographs typically are sold in one of two general ways. The first is to sell "stock" photography, which is photography that the photographer already has on hand. The second, generally more expensive method of sale is to sell "commissioned" or "assignment" photography whereby the purchaser commissions the photographer to take the desired photographs specifically for the purchaser's benefit. With assignment photography, generally either the purchaser buys all rights to the photograph(s), or the purchaser is granted a limited license and the photographer retains the rights. If the photographer retains the rights, he may later sell these photographs to another purchaser as stock photography, *i.e.*, photography already in his portfolio.

Plaintiff offered the photographs at issue in this case to Defendant Avnet as stock photography; yet every example upon which Trotto bases his opinion arose from his business as an *assignment* photographer. *See* Trotto Deposition, 11:13:35-11:14:23; *see also* Trotto Deposition, 16:33:37-16:35:40 ("Q. And every photographer has a different quality level like we've discussed. … you refer to a sample estimate on page 6, $4,116.62. And it's Appendix C. Is this an assignment job? A. This would be an assignment, yes. Q. And Appendix D, is that an assignment that? A. Would also be an assignment, yes.).

In *Baker*, the district court disqualified an expert under almost identical circumstances. There, the court wholly rejected plaintiff's proffered expert testimony involving *assignment photography* where the case at issue involved damages for the infringement of *stock photography*:

> First, [the expert] does not qualify by virtue of "knowledge, skill, experience, training or education" in the area in which her testimony and expert report are offered. As noted below, the damages issue at hand is the

value of [Defendant's] unauthorized use of the Photograph, a work that was indisputably in existence prior to [Defendant's] use. As such, the record is clear that it is referred to as a "stock" photograph. *See* ASMP, PROFESSIONAL BUSINESS PRACTICES IN PHOTOGRAPHY (6th ed. 2001) at 49 ("Simply stated, stock photography is existing photography...."). [The expert's] primary experience in photography has been in commissioned photographic work where a client hires a photographer to create a new work. The record is also clear that the factors applicable to pricing licenses of stock photographs are different from the factors applicable to pricing commissioned works.

The pricing of a stock photograph does not involve the[] same variables. The reproduction fee paid to the photographer for the use of a stock photograph is not based on a daily rate, and the ultimate license fee is not influenced by the same factors that influence a day rate. *See* Jim Pickerell & Cheryl Pickerell DiFrank, NEGOTIATING STOCK PRICES (5th ed. 2001) at 200 ("the client is not hiring someone to go out and produce something that is only a dream in his or her mind, as is the case in assignment photography. With a stock image, the client knows, before negotiations begin, exactly what he or she is buying ... Whether the image was taken by an experienced professional or an amateur has no bearing on its value.").

Rather, the pricing of stock photography is based upon the type of use, size of use and circulation. *See id.* at 210. The differences in pricing concepts for commissioned versus stock photographs simply represent the obvious differences in what is being purchased when one commissions a work versus what is being purchased when one licenses a stock photograph. This difference is explained as follows:

Assignment photography is new photography, commissioned and paid for by a client. We photographers are selling our ability to create a photograph and also the rights for the client to reproduce that photograph for a very specific usage and time period. In stock photography we are selling (licensing) rights to reproduce an already existing photograph. Michael Heron & David MacTavish, PRICING PHOTOGRAPHY (rev. ed. 1997) at 7. In view of these crucial differences in both purpose and practice, [the expert's] experience with pricing specially commissioned photographic shoots fails to qualify her as an expert on the matter of valuing a stock photograph.

*Baker*, 254 F. Supp. 2d at 353-55.

The situation at hand is almost identical to the situation in *Baker*: Trotto, the defense's purported expert, is an assignment photographer attempting to opine as to the value of stock photography:

Q.  And can you explain to me what you think shoot fee is?
A. I did make a statement in my report also that different photographers, different companies use different terms. It could mean the same as usage fee, creative fee, and other terms such as that.
Q. When you combine a usage fee and a creative fee, isn't that usually an assignment situation?
…
A.  I can't answer for all companies.
Q.  This is your definition of shoot fee.
A. My definition. Shoot fee is on my invoices, yes, if it is an assignment.
Q. But it wouldn't be on your invoices if it's a stock fee?
…
THE WITNESS: That is correct.

8050-0131-162                                   7

Trotto Deposition, 11:28:39-11:29:45.

> Q.     Okay. Let's go to page 4 of your report. You have a series of questions starting in the middle of the last paragraph. …
> A.     Yes, I see that.
> …
> Q.     What do these have to do with fees for situations where the act of using the copyrighted work was ruled willful infringement?
> …
> A.     To answer your question, some of the fees -- Dan Coogan had stock images so there were less factors involved with some of the variables on this page.

Trotto Deposition, 15:42:15-15:43:25.

> Q.   [I'll] call them shoot rates even though now you are using the term day rate in your report on page 6. Those are not stock sales, are they?
> A.   No, they are not.

Trotto Deposition, 15:51:10-15:51:22. Throughout Trotto's deposition, as well as his Report, he gives not *one* example of having ever priced stock photography. Even if he has priced stock photography, it does not comprise even a fraction of his business or, for that matter, his Report. *See*, *e.g.*, Trotto Deposition at 11:55:28-11:56:14. ("Q. And with all of these different trade associations saying the photographers should get copyright registrations, … my question to you is why haven't you gotten one? … A. I have not registered my images because most of my photo shoots are assignment photography and they are very proprietary to that company and of … relatively little use to other companies as opposed to a generic stock photos that most companies could pick up and use.").

Every example he gives, every invoice he attaches, and every basis upon which he relies for his expertise arises from assignment photography, not stock photography. Indeed, *Trotto has never registered a single photograph for a copyright*. Never. According to his Report and testimony, Trotto limits his practice primarily to assignment photography for which the purchaser retains all the rights; thus, because he is consistently assigning away all rights to his photographs, he has no need to file copyright registrations, which would be more necessary for a photographer engaged in stock photography. Not surprisingly, the exact same thing occurred in *Baker*, where the court noted,

> While [the expert] has experience in commissioned works, her experience in licensing is virtually non-existent. During her entire three-year career as a photographic agent, she has licensed one photograph to another party, and, even then, she was unable to recall many of the details of the transaction[.] …. [She] also testified that she purchased stock photography on three

occasions as to which she had very limited recollection but that she was not involved in the pricing. On this record, I find that [the expert] does not have sufficient "knowledge, skill, experience, training or education" in the licensing of stock photography to qualify as an expert in that area.

*Baker*, 254 F. Supp. 2d at 353-55; *see also Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705 (2d Cir. 1989) (holding that the testimony of a self-titled "forensic engineer" in a railway accident case should have been excluded where the purported engineer had no experience in railroading and was merely "an inexperienced layman posing as a railroad expert"). Thus, Trotto is not qualified to offer an expert opinion in this case.

### 3.    *Trotto's Opinion Is Not Based Upon Sufficient Facts or Data.*

An expert's testimony must be based upon facts and data sufficient to establish him as an expert. FED. R. EVID. 702. In *Zenith Elecs. Corp. v WH-TV Broad. Corp.,* 395 F.3d 416 (7th Cir. 2005), the expert's calculations of lost profits were based not on sufficient facts but, rather, on the witness's own "intuition" and knowledge of the relevant market. Excluding the testimony, the court held that the expert's "intuition" and knowledge should have been replaced with reliable principles and methods, such as looking at other markets to generate growth projections upon which to calculate lost profits. *Id*. at 419-20 (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term…. 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'").

Here, as in *Zenith*, Trotto did no research regarding copyright registration, copyright infringement, stock photography pricing, or photographs' fair market value:

Q. What research did you do for this report?
A. Aside from my 25 years of experience in bidding and pricing photography, I used Photo District News magazines.

Trotto Deposition, 09:44:34-09:45:50.

Q. … Was there anything else that you used?
…
A. No, I would have to say not.

Trotto Deposition, 09:50:20-09:50:57. Rather than conducting research, Trotto chose to rely on his own intuition and knowledge of how he prices his own photographs, *assignment* photographs. Moreover, other than one quote from a photography magazine

8050-0131-162                                        9

stating that photograph purchasers like to negotiate, Trotto's only other source of authority were clipped <u>excerpts</u> from two Ninth Circuit cases, provided to him by defense counsel.

> Q. Have you ever seen *Frank Music*[2] case?
> A. No.
> Q. So you've never read the opinion?
> A. No. I was provided that amount of information as a guide.

Trotto Deposition, 13:04:50-13:05:01.

> Q. …On page 9, you cite *Frank Music Corp v. Metro-Goldwyn-Mayer* and *Mackie v. Rieser*. … So my question to you is did you read both of those cases?
> A. I read about one of the cases. It must have been *Mackie v. Rieser*.[3]
>
> A. I'm not sure at this point.

Trotto Deposition, 13:06:20-13:07:08.

> Q. Did Avnet's counsel show you any other cases besides *Frank Music Corp v. Metro-Goldwyn-Mayer* and *Mackie v. Rieser*?
> A. No, it did not.
> Q. Did they ever inform you the holdings of the *Iowa State University Research Foundation* case[4]?
> …
> Q. Okay. I want to read you a quote from that case and the quote is that an infringer cannot expect to pay the same price in damages as it might pay after freely negotiated bargaining or there would be no reason to scrupulously obey the copyright law. Now, I know you're not a lawyer. Do you understand that?
> A. Yes. …

Trotto Deposition, 13:21:30-13:22:20. Thus, Trotto was not provided with the full scope of Defendants' infringements and/or uses; nor was he provided with, or familiar with, the status of the law on damages for infringement. Indeed, defense counsel provided him with only the partial standard for damages under *Frank Music*. Trotto's opinion not only fails to be based on sufficient facts, it fails to be based on any accurate facts at all.

### *4.    Trotto Utilized No Reliable Principles or Methods.*

The now-famous *Daubert* case listed five non-exclusive factors to utilize in assessing the reliability of scientific expert testimony: (1) whether the expert's conclusions can be tested, *i.e.*, challenged in an objective way, or whether they arise instead from a subjective, conclusory approach that cannot realistically be tested for reliability; (2)

---

[2] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985).

[3] *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

[4] *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 475 F. Supp. 78 (S.D.N.Y. 1979)

8050-0131-162                                   10

whether the technique or theory has been subject to peer review and/or publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. 579. These factors can also be applied, albeit more loosely, to non-scientific testimony such as Trotto's. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149-51 (1999). Additional factors can also apply. For example, on *Daubert*'s remand, the Ninth Circuit considered whether the expert was "proposing to testify about matters growing naturally and directly out of research [he] ha[d] conducted independent of the litigation, or whether [he]… developed [his] opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Similarly, the Supreme Court held that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, an expert's establishment that he conducted his research independent of the litigation "provides important, objective proof that the research comports with the dictates of good science." *Daubert*, 43 F.3d at 1317. In contrast, if a proposed expert's research is conducted in anticipation of litigation, the testimony is suspect. *See id.*

Simply finding some indicators of reliability and validity is not enough to render an expert's testimony admissible. *See*, *e.g.*, *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("not only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."); *see also Paoli*, 35 F.3d at 745 ("any step that renders the analysis unreliable… renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.")

Applying these principles to the testimony of the plaintiffs' experts, on *Daubert*'s remand the Ninth Circuit found that the *Daubert* standards set forth by the Supreme Court had not been met. The experts' research was prepared solely for purposes of the *Daubert* litigation, had not been peer reviewed, and not even been deemed worthy of comment by

the scientific community. 43 F.3d 1311. The experts also had not explained their methodology or verified it objectively. *Id*.  Thus, the expert's testimony was excluded.

Here, Trotto's Report consists merely of a series of conclusory statements that cannot be tested, have never been subject to any kind of peer review or even presented to any scientific or professional community, and have no known rate of error:

Q. I'd like you to look at I guess it's page 2 of the report. It's the first page of text and in the first paragraph you talk about how your opinions are based on your business practices; is that correct?
A. Yes.
Q. And they developed over the years by fair market competition; is that correct?
A. Yes.
Q. Now, fair market competition is that a concept … like fair market value to you?
A. Yes.
Q. You also identified your peers; is that correct?
A. Yes.
Q. Which appears would those be?
A. You're asking me to name individual photographers?
Q. That your business practices have developed? Yes, if you can.
A. One would be Doug Crouch who has been a commercial photographer for many years, Mark Skelne. I'm trying to think specifically of others. There may be others that I've talked to over the years. I'm sure there are. Tim Pinnell.
Q. When you say your business practices were developed by fair market practices, can you tell me what you meant by that?
… A. Business developed by fair market competition?
Q. I'm sorry. Competition, yes.
A. In the process of getting assignment photography or selling the stock photography, it boils down to a bidding war and you bid -- the client gets three bids for every job. We put out the bids--you bid too high, you lose the job. You bid too low, you don't make enough money on it.
Q. You don't think quality of photography has anything to do with that?
A. It has a lot to do with it.
Q. Do you think photographers' length of time in business has something to do with that?
A. Yes, it does, in most instances.
…
Q. Scope of the work to be done have anything to do with what's involved in the bid?
A. Yes.
Q. So there are a lot of factors besides price?
A. There are so many factors ….

Trotto Deposition, 11:44:07-11:48:44.

Trotto also freely admits that his practices have nothing to do with the industry standard; that he failed to even acquaint himself with the nature of the industry standard:

Q. You think that this is an industry-wide practice?
MR. GREEN: Object. I don't know what "that" is.
Q. Giving a volume discount for regular clients.
A. You're asking me if a volume discount -- I've already answered that question. I

8050-0131-162

12

know of other photographers who give volume discounts.
Q. But you don't know that it's an industry-wide standard?
A. I can say I know of a few instances of top photographers that do this.
Q. I see.
Q. What if you're a photographer that's reasonably well off and you don't need many clients, would they have to give volume discounts?
…
A. You're asking me if a well-off photographer would need to give a volume discount?
Q. That's right?
A. What would be the purpose of it?
Q. So they wouldn't need to give a volume discount?
A. They would not need to. They could if they wanted to, if they liked the client.
Q. I see. So it's kind of a I-like-the-client selection?
…
THE WITNESS: For me personally, if I like the client I will work so much harder for them, yes, if they treat me fairly.

Trotto Deposition, 15:51:41-15:53:20.

In short, Trotto's only so-called methods are his own subjective conclusions about what he, solely, in his own business, will charge for assignment photography. Moreover, in his deposition, Trotto was unable to substantiate dozens of statements made in his Report. In addition to the examples above, Trotto admitted that his Report was incorrect regarding his dates of incorporation, and that he had no idea if his statements regarding Plaintiffs' dates of employment with Trotto were entirely accurate. Trotto Deposition, 09:56:45-10:05:02; 09:51:06-09:54:06. Because he has no reliable methods, and cannot substantiate either complex or simple statements in his Report, his testimony must be excluded.

### 5. Trotto's So-Called Principles and Methods Are Inapplicable to the Facts of This Case.

An expert's testimony is not reliable if his principles and methods are not applicable to the particular facts of the case at issue. *See* Rule 702 Advisory Notes ("The amendment requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. … [T]he terms 'principles' and 'methods' … remain relevant when applied to testimony based on [non-scientific] technical or other specialized knowledge."). Similarly, in *Baker*, discussed *supra*, the Court held that, even if the proffered expert had been properly qualified, her "proposed expert testimony [wa]s inadmissible because it [wa]s neither relevant nor reliable." *Baker*, 254 F. Supp. 2d at 354. For example, the proffered expert in *Baker* determined the "base fee" for the license based

on the plaintiff's daily fee for a commissioned shoot for advertising assignments. *Id*. The issue, however, was not the valuation of the plaintiff's service had he been commissioned by the defendant to produce the photograph from scratch but, rather, "what a reasonable license fee would have been for [the defendant's] use of the already-existing photograph had [the plaintiff] licensed the Photograph to [the defendant]." *Id*. The same is true here. "By presenting an expert report where the starting point for calculating damages is [a] fee for commissioned work," rather than for stock photography, the *Baker* defendant, as well as Trotto in the instant case, "is engaging in the sort of 'apples and oranges' comparison that has been rejected in the past as irrelevant[.]" *Id*.; *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 281 (S.D.N.Y. 2000) (holding that the proposed expert's unfounded and irrelevant calculations "alone destroy the validity of his conclusions"). Thus the Court, as the gatekeeper under *Daubert*, must do more than simply "tak[e] the expert's word for it." *See Daubert*, 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."); *see also O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (upholding exclusion of expert testimony based on a completely subjective methodology).

As shown throughout Trotto's Report and deposition, Trotto utilized a subjective, "take-my-word-for-it" analysis that is not applicable to the facts of this case. In addition to basing all of his calculations on assignment photography, rather than the stock photography at issue, Trotto admitted that he used an untested, hypothetical approach:

> Q. Okay. Does your report illustrate you've endorsed hypothetical approach?
> A. Yes …
> Q. So is that the value of the infringement <u>after</u> the work has been injured or destroyed?
> …
> THE WITNESS: And I would say no.

Trotto Deposition, 11:23:11-11:23:55. Under *Daubert* and its progeny, and specifically *Baker*, Trotto's expert testimony cannot be admissible.

8050-0131-162                                    14

### 6. Trotto's Facts and Data Are Relied Upon By <u>No One</u> Except Himself.

An important element of determining reliability under *Daubert* is a showing that the expert's methods and conclusions have been accepted and utilized, or at least reviewed by others in his field. *See Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594 (9th Cir. 1996) ("When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied."). Here, Trotto freely admits that no one has approved his methods, no one has reviewed his methods, no one definitively uses his methods and, indeed, his methods are <u>not</u> the industry standard.

> THE WITNESS: … large agencies have come to me and stated up front that when I'm bidding they want all rights. It's becoming more common.
> Q. I see. So that means it's a preferred business practice in the photograph see community?
> …
> A. I can't answer preferred. I know of only my business.
> Q. And when you talk about large agencies, do you also know about large stock houses?
> A. I personally don't purchase from large stock houses. So my knowledge of them only comes from what I have read.

Trotto Deposition, 14:01:49-14:03:35.

> Q. Now, as to the next paragraph in your report, we're on page 3 of your report. I have to ask you that just because you prefer to package usage in order to save the client time in tracking individual rights granted. Is that the industry standard?
> …
> A. That's why I said I prefer. It is not an industry standard. It's what I've adopted as a time saving element.

Trotto Deposition, 14:08:55-14:09:31.

> THE WITNESS: As I have stated. This is a sample bid for similar work done for doing an executive portrait and giving the client full rights to usage.
> Q. And these are your charges?
> A. These would be my charges, yes, and the total there is $4,116.62.
> Q. But this is not necessarily an industry standard charge?
> …
> A. I answered that question before. There's no industry standard.
> …
> Q. Did you discuss any of these appendices with any other photographers?
> A. No.

Trotto Deposition, 16:44:51-16:45:48.

Again, the *Baker* case provides guidance:

> This type of calculation, ignoring, as it does, recognized industry practice, "alone destroys the validity" of the expert's conclusions. *See Johnson Elec.*, 103 F. Supp. 2d at 281.
> … [The expert] provided no explanation [for her model] other than her *ipse*

*dixit* that Baker is "contractually required to compensate the model," an assertion that finds no support whatsoever in the record… . [The expert] also included a calculation of $ 40,000, purportedly based upon "industry practice" (though wholly unsupported by any citations), for the colorization and addition of [the defendant's] logo to the Photograph.

…

In sum, [the expert] does not possess the "knowledge, skill, experience, training or education" to opine on the value of a license … to use the Photograph. Even if she did, the base fee number is founded on an incorrect premise, viz., a commissioned photograph rather than a license to use an already existing photograph, the multipliers applied in her report are speculative, and the final damage calculation is speculative and without basis. Accordingly, [the defendant's] motion in limine to exclude [the] expert report and expert testimony is granted.

*Baker*, 254 F. Supp. 2d at 353-55. Similarly, Trotto's expert testimony must be excluded.

### B.    Trotto's Bias Alone Disqualifies Him

This Court has the inherent authority to disqualify Trotto as an expert. *See Campbell Ind. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) (recognizing the District Court's broad discretion to exclude the testimony of witnesses, including experts, whose use at trial is prejudicial or in bad faith); *see also Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996) (recognizing the federal courts' inherent power to disqualify expert witnesses). In addition to the Court's inherent power to disqualify Trotto, the Court also must exclude testimony that is overly prejudicial. *See* Rule 403, FED. R. EVID. ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay …."). Here, Trotto's testimony is extremely prejudicial due to his extensive biases, including the following:

- Trotto employed Plaintiff in Trotto's photography business during which, presumably, confidential information was exchanged between the two.
- While employed with Trotto, Plaintiff was laying the groundwork to open his own photography business.
- After Plaintiff stopped shooting photography for Defendants due to Defendants' infringement, Trotto stepped in and took Plaintiff's place with Avnet.
- Trotto has been paid over $50,000 by Avnet for his assignment photography.
- Trotto admits that he would do anything to preserve his relationship with Avnet.

*See*, *e.g.*, Trotto Deposition, 09:51:09-49; 09:53:40-48; 16:19:23-16:22:01; 10:57:47-55; and 14:51:42-48; *see also* Trotto Deposition as quoted below:

Q. In your own words, can you tell me why you believe Avnet would have selected you to be its expert witness? (Trotto Deposition, Exhibit C at 10:13:12-15)

… A.. Avnet may feel that I have a fair pricing policy. (10:13:25-29)

8050-0131-162                                    16

Q.  And that's because you've worked for them for the last two years? (10:13:32-34).

… THE WITNESS: To be correct, I think it's -- 'maybe three years that I've done photography for Avnet and, yes, from Avnet's perspective, that would be the only thing they know is the invoices that they have seen and the bids on John's that they have seen for Avnet. … (10:13:48-10:14:07)

…

Q.  Have you or Avnet discussed taking any steps to ensure you would not be biased when producing your report? (10:15:32-10:15:35)

… A.  The only step we took was that it was requested of me that I not call or contact any other people being photographers in the Valley, that this was my opinion. (10:16:09-19)

…

Q.  Did do you anticipate a next Avnet photographic project?

A.  According to our past history and their satisfaction, I would assume that I would get additional assignments but there are no guarantees in my business. (10:16:43-59).

…

Q.  Do you remember what the total Avnet has paid you was?

A.  Yes. The total -- they were 29 invoices. I believe it was $50,000 over the course of three years.

Q.  Do you remember the time frame exactly? Does January 17, 2003, to October 12, 2005, sound correct?

A.  That sounds correct, yes. (10:57:41-10:58:14)

…

Q.  Is it fair to say you want to keep Avnet as a photography client?

A.  Yes, it would be.

Q.  Is it fair to say you would not do anything to jeopardize losing Avnet as a client?

A.  Yes. (14:51:37-48).

Trotto's testimony confirms that he not only has biases by virtue of having employed Plaintiff, having presumably obtained confidential information from Plaintiff, and currently being a direct competitor of Plaintiff's, but he will do *anything* to preserve his working relationship with Avnet. These biases, combined with Trotto's complete lack of qualifications or proper methodology under Rule 702, FED. R. EVID., require that Trotto be disqualified as an expert in this case.

## III.    CONCLUSION

As set forth in detail herein, Plaintiff respectfully requests that the Court enter an Order disqualifying Trotto as an expert and precluding Defendants, their counsel, and their witnesses from making reference to and/or introducing evidence regarding Trotto, his Report, or his testimony.

RESPECTFULLY SUBMITTED this 9th day of February, 2006.


By: s/Jordan M. Meschkow
Jordan M. Meschkow
Lowell W. Gresham
MESCHKOW & GRESHAM, P.L.C.
5727 North Seventh Street
Suite 409
Phoenix, Arizona 85014-5818


CERTIFICATE OF SERVICE

I hereby certify that on 9 February 2006 I electronically transmitted the attached document and its Exhibits to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jordan Greene and Charles Houston
FENNEMORE CRAIG
3003 North Central Avenue, Suite 2600
Phoenix, Arizona 85012-2913

Attorneys for Defendants


s/ Jordan M. Meschkow

8050-0131-162                              18